# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

SANDRA DEE MORRISON,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C12-3005-LTS

**ORDER**

---

## *Introduction*

The plaintiff, Sandra Dee Morrison, seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for disability insurance benefits ("DIB") and disabled widow's benefits under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Morrison contends that the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that she is not disabled.

## *Background*

Morrison was born in 1959, graduated from high school and attended cosmetology school and truck-driving school where she obtained her Class A commercial driver's license. AR 34. She previously worked as a sandwich maker and waitress. AR 389. Morrison applied for DIB, disabled widow's benefits, and SSI on October 14, 2009. AR 145, 149, 152. She alleged disability beginning on November 1, 2006, due to panic and anxiety attacks, chemical imbalance, manic episodes, suicidal ideation, diabetes, and high blood pressure. AR 284. The Commissioner denied Morrison's applications initially and again on reconsideration. AR 64, 68, 74, 79, 82,

85. Morrison requested a hearing before an Administrative Law Judge ("ALJ"). AR 88-89. On October 19, 2010, ALJ John E. Sandbothe held a hearing in which Morrison and a vocational expert ("VE") testified. AR 30.

On December 2, 2010, the ALJ issued a decision finding Morrison not disabled since the alleged onset date of disability of November 1, 2006. AR 11-21. Morrison sought review of this decision by the Appeals Council, which denied review on November 18, 2011. AR 1-3. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

On January 20, 2012, Morrison filed a complaint in this court seeking review of the ALJ's decision. On January 26, 2012, with the parties' consent, United States District Judge Mark W. Bennett transferred the case to then Chief United States Magistrate Judge Paul A. Zoss for final disposition and entry of judgment. On June 8, 2012, the case was reassigned to me. The parties have briefed the issues, and the matter is now fully submitted.

## Summary of Evidence

### A. LaPorte Hospital

Morrison reported to LaPorte Hospital in LaPorte, Indiana, on April 1, 2005, with severe depression, reports of hearing voices, difficulty handling stress, and a general inability to function. AR 393. Morrison's brother had died that day from a heroin overdose and Morrison found him on her bathroom floor. AR 395. Morrison had also recently lost her daughter on February 1, 2005, who died from complications related to pulmonary fibrosis. AR 395. Morrison lost significant weight during this time, and said she had no appetite and had not been eating. AR 398.

Dr. S.L. Prasad Babu performed a psychiatric evaluation and noted Morrison had been suffering with depression for the past several years. Morrison explained she had previously been diagnosed with bipolar disorder and diabetes. AR 401-02. She denied current drug use, but a urine analysis came back positive for opiates,

2

cannabinoids, and benzodiazepines. AR 393. Morrison had abused drugs in the past and served three years in prison for interstate trafficking of cocaine. AR 401-02. In evaluating Morrison's mental status, Dr. Babu noted she was extremely anxious, nervous, tense, and appeared sad and depressed. AR 402. She was feeling withdrawn, hopeless, and worthless and her hands were shaky and tremulous. AR 401. Dr. Babu remarked that Morrison tried to be cooperative in her attitude and was relevant, spontaneous, and able to express her feelings well. AR 402. She had crying spells and had not been sleeping well. *Id.* Dr. Babu assessed a Global Assessment of Functioning ("GAF")[1] score of 30. Morrison saw Dr. Babu daily for individual therapy, evaluation, and medication management until her discharge on April 7, 2005.

Upon discharge, Dr. Babu found Morrison had been sleeping well, eating fair, and was not depressed. AR 393. Morrison could pay attention and concentrate, and her appearance and hygiene were clean and neat. *Id.* Dr. Babu said she was alert and ambulatory and felt that she could be handled as an outpatient. *Id.* She was advised to follow up at Swanson Center where she had previously gone for counseling. AR 395.

## B. Swanson Center

Morrison began voluntarily treating at Swanson Center in February 2005 with Ann Simmons, a clinical social worker. AR 434. At this time Morrison was working two jobs. She had been at JoAnn Fabric since August 2004 and at Subway since November 2004. Morrison reported she was diagnosed with bipolar disorder in May 1999 after she was hospitalized for attempted suicide. AR 584. She had been taking psychotropic medications for the past 20 years. Morrison was raised by foster parents,

---

[1]A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV). A GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.*

but maintained contact with her birth parents since she was age 18. Morrison reported she was abused verbally, emotionally, sexually, and physically by her foster dad, foster brother, ex-husband, and current husband. She was sexually abused from ages 4 to 17. *Id*. Morrison previously had substance abuse problems, but she had gone through treatment during incarceration and denied using drugs since. *Id*.

In February 2006, Ms. Simmons completed a treatment summary and an annual clinical assessment. AR 446-47, 453-455. In the treatment summary, Ms. Simmons noted that Morrison attended appointments regularly and took her medication as directed. AR 446. Morrison had made progress on some of her treatment goals. She was functioning at a higher level due to her employment with Subway and she had been approved to purchase a new mobile home. She was staying busy by doing sewing jobs on the side. She had recently filed for divorce and was helping her husband move into his own apartment. However, Morrison still struggled with relationship issues. She tended to isolate herself from others and spent a majority of time in her bedroom. Overall, Ms. Simmons found that Morrison had demonstrated improvement in therapy within the last two months. She had improved eye contact, was able to initiate conversation, and was listening more attentively. She was also more enthusiastic and motivated and meeting some of her goals seemed to have increased her desire to continue improving her level of functioning. *Id*.

In the annual clinical assessment, Ms. Simmons noted that Morrison said her anxiety had somewhat decreased. She had fewer symptoms of depression and she attributed the reduction in her anxiety and depression to her recent employment and keeping busy. However, she still felt sad and worried and she had difficulties with crying, focusing on tasks, and withdrawing from others. Ms. Simmons also commented on Morrison's recent memory, which she described as "somewhat impaired." AR 454. Morrison explained she was very forgetful and frequently needed to write things down in order to remember what she needed to do during the day. She also relied on her children to help her with these memory problems. Morrison's

orientation, information, intelligence, judgment, insight, and reliability were all within normal limits. Ms. Simmons noted that Morrison continued to demonstrate symptoms of significant emotional distress with depression and anxiety. She mentioned Morrison's continued difficulty with various events such as the death of her daughter, her divorce, moving homes, and returning to the work place. AR 455. She recommended that Morrison continue individual therapy and medication management.

In a Report of Psychiatric Status, requested by the Social Security Administration in July 2006 as part of a previous disability application, Ms. Simmons noted that Morrison's current GAF score was 45 and her highest in the past year was 52. AR 434. Ms. Simmons noted that manifestations of Morrison's mental disorder included significant mood swings, rapid and loud speech, transference issues when describing relationship problems, obsessive thinking about problems and perceived wrongdoings, racing thoughts, overly talkative, easily distracted, increase in work, sexual indiscretions, and mood changes that were noticed by her adult children. AR 435. She also noted Morrison had not used drugs and was able to continue with employment. *Id.* Finally, she added that Morrison had suicidal ideations, was tearful and sad, and lacked an appetite. *Id.*

In assessing Morrison's remote memory, Ms. Simmons noted that Morrison was preoccupied with her current problems and issues and had difficulty with concentration. AR 436. She wrote that Morrison reported forgetfulness, losing items, and frequently repeating herself. *Id.* In describing her functional capacity, Ms. Simmons stated Morrison was able to perform a majority of job duties as long as she was not distracted. Morrison needed a consistent repetitive pattern in order to do work and if she became distracted, she had difficulty and would have a panic attack. AR 438. Ms. Simmons also advised that Morrison needed supervision. As an example, she stated that Morrison's forgetfulness would have caused an error with a restaurant inspection where she was working had the supervisor not caught it.

In describing her social interaction, Ms. Simmons stated that Morrison had significant relationship problems with close family members, such as her mother, adult children, and her ex-husband. AR 438. She stated Morrison was unable to set boundaries, would become very resentful, angry, and full of rage. Morrison would verbally lash out towards her family and she had recently hit her adult son. *Id.* Ms. Simmons noted that these symptoms would be limiting because Morrison needed to work with few people and she preferred to work alone. *Id.* Her current supervisor had arranged for her to work an overnight shift to accommodate this limitation. Ms. Simmons also described Morrison's difficulties with multi-tasking and explained that she required a very structured, simple routine, or she would become distressed and emotional. *Id.* Ms. Simmons thought Morrison could maintain employment if the job was a regular, simple, structured routine with constant supervision. *Id.*

As for Morrison's ability to deal with stress, Ms. Simmons cited a recent example where Morrison became very angry at work because an employee from the previous shift had not fully completed a task. *Id.* Ms. Simmons wrote Morrison "became enraged, making a fist, feeling enough stress to begin to trigger an anxiety attack." *Id.* She said that Morrison would hide in the bathroom or the cooler so her boss would not see her in an emotional state. *Id.*

Ms. Simmons stated Morrison's current prognosis was fair/poor and that Morrison had not been compliant with treatment due to inadequate funds. AR 439. She explained that Morrison's symptoms had increased due to her noncompliance. *Id.*

On January 4, 2008, Morrison was admitted to LaPorte Hospital due to depression, suicidal ideations, stress, and difficulty sleeping. AR 700. She had lost her job and her boyfriend left her. *Id.* She underwent a psychiatric evaluation and her GAF score was 35. AR 704. She reported hearing voices on a daily basis that told her to end her life. AR 705. She said she wanted to "end it all" and had plans to walk in front of a moving truck. *Id.* Morrison was out of her Topamax medication for a couple of months and had not taken any Seroquel for three days. *Id.*

Morrison's appearance was extremely disheveled and she had poor hygiene. AR 707. She was withdrawn and easily distracted. She exhibited some insight and her judgment was fair, but her mood was very depressed and anxious. *Id.* Her thought processes were linear, but the content was "helpless, hopeless and contain[ed] hallucinations as well as suicidal ideations." *Id.* Her affect was sad and her motor activity slow. Her orientation and memory were intact and she was able to make eye contact. *Id.* Morrison was discharged on January 7 after Dr. Babu found she was handling her medications well, getting sleep, and eating fair. Her GAF score was 49. AR 700.

On July 8, 2008, Morrison was deemed discharged from Swanson Center. AR 713. She had not responded to outreach and there were 90 days of no contact. Her prognosis was assessed as "fair." *Id.* Morrison had requested that her individual therapy be discontinued in February 2007. AR 714.

### C. Berryhill Center for Mental Health

On September 22, 2008, Morrison reported to Berryhill Center for Mental Health ("Berryhill") for a psychiatric evaluation. She was completing the licensing process of the Iowa Central transportation program and the doctor who performed her physical required her to get a psychiatric evaluation after Morrison reported she had stopped taking Trazodone on her own. AR 737. During the evaluation, Morrison said her medications were satisfactory for controlling her bipolar symptoms. AR 738. She had no concern over symptoms of depression or anxiety and she was sleeping fine. *Id.*

Kyle McCard, a licensed social worker, found that her mood/affect, thought content, thought process, memory, attention and concentration, intelligence, abstract thinking, insight, judgment, and impulse control were within normal limits and no other abnormalities were noted. AR 740. He stated Morrison expressed a desire to improve her level of functioning and he assessed a GAF score of 60. AR 741.

Monte Bernhagen, M.D. also evaluated Morrison. AR 733. Morrison described her bipolar disorder to him as having highs and lows, but said she tended to have more highs. *Id.* She said her manic symptoms could last for weeks. *Id.* At her low points she wanted to sleep all day and stay to herself. *Id.* These episodes could last two to three days and would occur about every three months. *Id.* She denied a lack of concentration, stating her medication helped and she was also sleeping well. *Id.* Morrison reported rare episodes of isolation and denied a lack of interest or motivation.

Dr. Bernhagen found that Morrison had normal psychomotor activity, was alert and oriented with a euthymic mood, a pleasant and bright affect, goal-directed thought process, normal range of intelligence, and no difficulty with attention, concentration, abstract thinking, insight, judgment, and impulse control. AR 735. He assessed a GAF score of 70 and recommended she continue her current medications. AR 736.

Morrison reported to Berryhill again on December 15, 2008, stating that she was experiencing extreme anxiety and mild panic attacks. AR 732. She had weaned herself off benzodiazepines for her truck driving job, which had not worked out. *Id.* Dr. Bernhagen changed her medication. *Id.* Morrison's next visit was in March 2009. She had just returned from visiting her children in Indiana for a month. Dr. Bernhagen noted she was adequately groomed and appropriately dressed. She was cooperative and made adequate eye contact. Her psychomotor activity was normal, mood euthymic, and affect congruent. Her thought process was goal-directed, thought content benign, sensorium cognition grossly intact and judgment and insight fair. AR 731.

At Morrison's next appointment in June 2009, she reported that she was working at Casey's and had been accepted for a truck driving job. AR 730. At this appointment, Dr. Bernhagen noted that her mood was a little dysphoric and her affect a little blunted. *Id.* Otherwise, her functions were within normal limits. *Id.*

In September 2009, Morrison described various struggles. AR 728. Her ex-husband had recently died and she was responsible for his car payment. Her children were upset with her and she did not get the truck driving job because of her legal

history. She had also lost her job at Casey's and lost a subsequent job at a glove factory because she had missed work to attend her ex-husband's funeral. *Id.* She indicated that she was going to apply for disability. *Id.* She had normal psychomotor activity with a mildly dysphoric mood and congruent affect. *Id.*

In early November 2009, Morrison's condition had worsened. AR 751. She was clinically depressed and stated her boyfriend was extremely mean to her because she was still unemployed and not contributing financially to the household. *Id.* She explained that everyone in her family had rejected her and she had no place to go. She denied suicidal ideation, but said she wished she could go to sleep and not wake up. *Id.* Morrison had applied to jobs at multiple places but could not seem to get hired. *Id.* Dr. Bernhagen noted that her psychomotor activity was decreased, her mood was significantly depressed with a congruent affect, and she was tearful throughout the interview. Dr. Bernhagen added Seroquel to her medication and she went to individual therapy. AR 752. In therapy, she indicated that she wanted to move away from her boyfriend and Mr. McCard gave her emergency housing services to contact. AR 753. Five days later, he noted some improvement and that the medicine seemed to be having some positive results. AR 754.

In late November, Morrison was still having difficulties. AR 851. She said the Seroquel had not been beneficial except for helping her sleep for a couple of hours. Dr. Bernhagen changed her medication. *Id.* He reported she had decreased psychomotor activity, a significantly depressed mood with a congruent affect and she was tearful throughout the interview. Morrison stated she wished she was not around anymore, but she denied any suicidal intent, plan, or ideation. *Id.*

In December 2009, Morrison still complained of panic and anxiety symptoms and stated she had felt manicky. AR 848. Dr. Bernhagen noted that her psychomotor activity was fairly normal and her mood had improved slightly. *Id.* He made no changes to her medication at this time, but wrote that he may add Lithium later. *Id.* During therapy, Morrison mentioned her disability application. AR 850. Mr. McCard

told her it depended on whether she was capable of any type of gainful employment whatsoever. *Id.* Morrison mentioned that she may continue to look for employment, but she had almost given up on it because of her felony conviction. *Id.*

In January, Morrison reported to Dr. Bernhagen that she was not doing any better and was feeling significantly depressed. AR 846. She was having mild thoughts of suicidal ideation, but was able to contract for safety. *Id.* She also had not been taking her medication as prescribed, and Dr. Bernhagen noted this was probably the reason she was not doing well. *Id.* She had decreased psychomotor activity, depressed mood, flat affect, and her judgment and insight were limited. *Id.*

In February, Morrison reported to Mr. McCard that she had been denied disability benefits and was looking for part-time work. AR 845. She said she was taking her medication regularly again and trying to maintain a positive outlook. *Id.*

In March 2010, Morrison was still not doing well. Her boyfriend was moving out and Morrison had nowhere to go. She was working with Vocational Rehabilitation, but said her options were running out. AR 842. She was again having mild suicidal ideation. Dr. Bernhagen reported she had limited eye contact with decreased psychomotor activity. Her mood was depressed and her affect flat. Her judgment and insight were limited. Dr. Bernhagen noted that she must not have been complying with her medications since it had been over a month since he last prescribed them and she had not called in for refills. *Id.* In therapy, she was encouraged to keep applying for jobs. AR 844. About a week later, Morrison reported looking for jobs and was going to temp agencies. AR 841. At the end of March, Morrison told Mr. McCard she still had not found a job and had recently been rejected from one. AR 840. She made plans to return to Indiana to live with some friends. *Id.*

Morrison reported to Dr. Bernhagen again in July 2010 after returning from Indiana where she had stayed with friends. AR 906. She was still struggling with depression and had become suicidal to the point her friends wanted to have her committed. *Id.* She had moved back in with her boyfriend and continued to have a

difficult relationship with her children.  *Id.*  Morrison was cooperative and made adequate eye contact at this appointment.  She had normal psychomotor activity, a euthymic mood, and significantly improved affect.  Her judgment and insight were also improved and she denied thoughts of self-harm.  *Id.*

Morrison attempted suicide on August 29, 2010.  AR 890.  She had a fight with her boyfriend and he told her to move out.  *Id.*  She had been feeling depressed and decided to kill herself.  *Id.*  She took 20 clonazepam tablets.  She was transported by ambulance to the emergency room of Trinity Regional Medical Center in Fort Dodge, Iowa.  *Id.*  The hospital received a court order to detain her and she was transferred to the mental health unit at Allen Hospital for a full mental evaluation.  *Id.*

Dr. Raja Akbar performed Morrison's psychiatric evaluation.  AR 888-89.  He found her alert, oriented to time, place, and person with intact memory and normal intelligence.  *Id.*  She cried off and on and readily admitted to depression.  *Id.*  Dr. Akbar resumed her medications and she was discharged on September 1.  AR 904.

Patricia Hull became Morrison's new therapist on September 2, 2010.  AR 904-05.  Hull found Morrison was depressed and overwhelmed with the breakup of her relationship.  She had limited resources and support.  She was tearful and felt hopeless but contracted for safety.  *Id.*  Ms. Hull assessed a GAF score of 50.  *Id.*  On September 3, Morrison was doing better.  AR 903.  She had worked things out with her boyfriend and was feeling more positive.  *Id.*  Her boyfriend was going to be gone the next four days though and Morrison explained she had difficulty being alone.  *Id.*  Ms. Hull encouraged her to seek help at the Friendship Center for loneliness and isolation and she reviewed crisis services that were available after hours in case Morrison's suicidal thoughts returned.  *Id.*  Her GAF score was 53.  *Id.*

On September 20, Morrison reported she had obtained temporary employment through USA Staffing.  AR 902.  She was finding it difficult to work each day, but realized it was necessary to maintain a place to live.  *Id.*  She stated she had an attorney who was helping with her Social Security appeal and she brought in forms she needed

help filling out. *Id.* She said she had difficulty focusing her thoughts and she continued to think of suicide. *Id.* Her GAF score was 51. Dr. Bernhagen increased her antidepressant. AR 901. He noted she had limited eye contact, decreased psychomotor activity, depressed mood and a sad and tearful affect. Her judgment and insight were also mildly impaired. *Id.* Dr. Bernhagen saw Morrison again two days later. AR 899. She was doing a little better and no longer having suicidal thoughts. *Id.* She was cooperative with adequate eye contact, and her judgment and insight were improving, but all other findings remained the same. *Id.*

On September 28, 2010, Morrison reported she had been terminated from her job for not being efficient enough. AR 898. She said she continued to feel overwhelmed and often felt worthless. *Id.* Her GAF score was 52. Dr. Bernhagen noted she was cooperative and maintained adequate eye contact. Her psychomotor activity was slightly increased, although her mood remained depressed and she also seemed anxious. *Id.* He noted her judgment and insight continued to improve.

Dr. Bernhagen completed a mental RFC questionnaire on September 29, 2010, at the request of Morrison's attorney. AR 878-885. Dr. Bernhagen stated Morrison's prognosis was poor and identified the following signs and symptoms: anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, impairment in impulse control, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, emotional withdrawal or isolation, intense and unstable interpersonal relationships and impulsive and damaging behavior, deeply ingrained maladaptive patterns of behavior, easy distractibility, sleep disturbances, and bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes). AR 881-82. He found Morrison was unable to meet competitive standards for nearly all mental abilities and he noted she had no useful ability to function in the categories of: maintaining

regular attendance and be punctual within customary, usually strict tolerances; completing a normal workday and workweek without interruptions from psychologically-based symptoms; setting realistic goals or making plans independently of others; and dealing with stress of semi-skilled and skilled work. AR 881-83. He noted, "Sandra is severely depressed. She has not been able to maintain or sustain employment due to these symptoms. She has difficulty with concentration and memory. It is hard for her to maintain regular attendance, follow simple instructions or adapt to changes in the workplace." AR 882. He also wrote, "Sandra has a history of anxiety and panic as well as a borderline personality. She fears rejection from others, but often behaves in ways making it difficult to maintain socially appropriate behavior." AR 883. He assessed a GAF score of 40. AR 879. Dr. Bernhagen estimated that Morrison's impairments would cause her to be absent from work more than four days per month and the earliest date that applied for her limitations was December 15, 2008. AR 885.

### D. Iowa Vocational Rehabilitation Services

Morrison sought help finding employment from vocational rehabilitation in November 2009. AR 860. During her intake, she told the counselor she had worked at Casey's for three months, but quit because she was very emotional and could not handle criticism well. *Id.* The counselor developed a plan in February 2010 for Morrison to seek employment as a truck driver or factory worker. AR 861.

In March, Morrison told the counselor she had not filled out an application for a truck driving job she had called about in February. She explained she was concerned about seeking work in an area where she was unsure of the surroundings. *Id.* The counselor noted that she was crying during most of their meeting, and advised her to see Dr. Bernhagen regarding her medications. *Id.* By the end of the month, Morrison had relocated. She stated she was continuing to seek Social Security benefits and she had been turned down by various employers. *Id.*

### E. Consultative Examinations

Sharon Sacks, Ph.D., performed a consultative mental status examination on June 19, 2006 as part of a previous disability application. AR 543. She noted that Morrison was seeking disability due to panic attacks, chemical imbalance, and bipolar disorder. *Id.* Morrison appeared to be having an anxiety attack when she arrived and remained anxious throughout the evaluation. *Id.* She reported she was able to function fairly well while taking her medication, but experienced intense symptoms without it such as mood swings, poor concentration and focus, horrific panic attacks, fear of losing control, grief, social phobia, and an inability to interact with people. *Id.* Morrison also said she required assistance with her personal needs. She was able to dress, shower, and groom with some assistance from her son who washed her clothes for her every night since she wore the same clothes each day. AR 544. Her son also helped with cooking and general housekeeping.

Dr. Sacks assessed a GAF score of 55. AR 545. She stated that Morrison's presentation and history suggested functional impairment. Dr. Sacks noted that Morrison required constant assistance from her son and was clearly struggling with ongoing anxiety and grief-related issues. She said Morrison's persistence and ability to sustain concentration appeared poor, but this was most likely related to her increased anxiety level. She also stated that Morrison had poor social interaction. *Id.*

Dr. Joseph Latella performed a consultative physical examination on February 10, 2010. AR 798. Morrison reported back pain that had not been treated for the past four years. *Id.* Dr. Latella found she could walk without gait disturbance, crawl, kneel, and climb stairs slowly. *Id.* Morrison said she had not sought treatment because she did not have insurance. *Id.* However, she had been treated for hypertension for the past six years and had also been taking medication for her diabetes. With the exception of Metabolic Syndrome, Dr. Latella found no abnormalities and her extremities and joint movements were all within normal range. AR 799.

Dr. John May reviewed the medical evidence, including Dr. Latella's report, and concluded that it did not show Morrison had a severe physical impairment that would significantly limit her ability to perform work activity. AR 800. J. Sands, M.D., reviewed all of the evidence in the file and affirmed Dr. May's conclusion on April 23, 2010. AR 868.

### F. State Agency Medical Consultants

Lon Olsen, Ph.D., performed a mental RFC assessment on December 16, 2009. AR 755-57. He noted Morrison had moderate limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. *Id.*

Dr. Olsen noted that Morrison's alleged onset date was November 1, 2006, but there was no mental health information from late 2006 until September 2008. AR 757. As for her functional abilities, Dr. Olsen noted that Morrison was living with a friend, needed reminders to take medication, and had trouble with finances. *Id.* She also needed reminders to go places and required someone to go with her. She had difficulty getting along with others, including authority figures at times. *Id.* Morrison was forgetful and easily distracted and had to read instructions several times to understand them. She had difficulty following spoken instructions and responded poorly to stressors and changes in routine. Third party reports suggested that she could maintain attention and follow instructions with the help of her medication. *Id.* Dr. Olsen concluded, "The claimant's allegations about her functional limitations are partially supported by the evidence. Her condition responded well to appropriate treatment and she is capable of moderately complex activities that do not require intense concentration, extensive social interaction or frequent changes in routine." *Id.*

Dr. Olsen also completed a Psychiatric Review Technique based on Morrison's affective disorder. AR 759-771. He found that Morrison had mild limitations in activities of daily living, moderate limitations in maintaining social functioning and concentration, persistence, or pace, and no episodes of decompensation. AR 769. J. Gange, Ph.D., affirmed Dr. Olsen's assessment as written on April 20, 2010. AR 864.

*Hearing Testimony*

**A.    *Plaintiff's Testimony***

At the administrative hearing, Morrison testified that she graduated high school, went to cosmetology school, and got her Class A commercial driver's license. AR 34. She said she had been in special education classes since second grade for reading and arithmetic, but she was able to write and do simple math. AR 34-35. She testified that she was currently treating through Berryhill and saw both Dr. Bernhagen and Ms. Hull once a week. *Id.* Morrison acknowledged her past history of drug use, but stated since she was released from incarceration she had not used or abused any illegal drugs or alcohol. AR 37.

When asked about her mental conditions, she explained that her depression caused her to withdraw and she would not want to be around anybody. *Id.* She said she could not stay focused on anything she tried to do. *Id.* Morrison also testified that being around other people would give her anxiety and she could not go places where there would be a lot of people. AR 38. She had given up bingo and bowling because she had difficulty handling the crowds. AR 42. She said she experienced crying spells on a daily basis and she was not sure what triggered them. AR 38. Morrison said her bipolar disorder caused her to have severe ups and downs creating good days and bad days. AR 38-39. She experienced bad days at least two or three times a week where she would not leave the house or talk to anyone. AR 39. On her good days, she was

able to get out, pay her bills, go grocery shopping, clean the house, and cook. *Id.* She said she could not do any of those activities on the bad days. *Id.*

Morrison testified that she had trouble with her memory and had to be reminded of appointments. She also had difficulty with reading and verbal comprehension. She explained she needed people to repeat things and explain them because she could not understand what they were saying. AR 40. She testified that concentrating on tasks was also difficult for her. She said she used to be a seamstress, but she could no longer concentrate long enough to do any sewing. AR 41. She was unsure whether she had difficulty getting along with others because she did not often associate with others. *Id.*

Morrison briefly discussed her suicide attempts. *Id.* She said she attempted suicide twice—once in 1998 and again a few months before the hearing. She said she was hospitalized for four days and two individuals filed for committal. AR 41-42.

The ALJ asked Morrison about her current financial and housing situation. Morrison said she lived with her boyfriend who helped pay the bills. AR 43-44. She said she would spend her day doing household chores and baking and that sometimes she would clean just to be doing something. AR 45. She thought the reason she could not hold a job for a significant period of time was because of the anxiety attacks she experienced being around other people. AR 44.

### B. Vocational Expert's Testimony

The ALJ summarized Morrison's vocational/medical background as a 51-year-old woman with a high school education and relevant work as noted in the VE's past relevant work summary. AR 46. She had been diagnosed with depression, bipolar disorder, diabetes, and obesity. *Id.* The ALJ gave the VE the following hypothetical: "I find she has no physical limitations to speak of; however, she would be limited to simple, routine, repetitive work; superficial contact with the public; regular pace." AR 46. The VE testified that Morrison would be unable to perform any of her past

relevant work under this hypothetical, but she could do work as a laundry worker, kitchen helper, or cook's helper. AR 46-47.

The ALJ gave another hypothetical involving the same vocational/medical background and same limits as above, but added no contact with the public and slow pace for up to one-third of the day. AR 47. The VE stated that such a person would not be employable on a full-time competitive basis. *Id.*

Morrison's attorney also asked the VE a hypothetical. He stated the hypothetical individual could not satisfactorily perform the following activities on an independent, appropriate, effective, and sustained basis in a work setting: understand, remember, and carry out very short and simple instructions, maintain attention for a two-hour segment, make simple work-related decisions, get along with co-workers and peers, and deal with normal, everyday work stress. AR 47-48. The VE testified that such a person could not be competitively employed on a full-time basis. AR 48.

### Summary of ALJ's Decision

The ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

(2) It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.

(3) The prescribed period ends on August 31, 2016.

(4) The claimant has not engaged in substantial gainful activity since November 1, 2006, the alleged onset date.

(5) The claimant has the following severe impairments: depression; bipolar disorder.

(6) The claimant does not have an impairment or combination of impairments that meets or medically equals of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(7) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine, repetitive work with only superficial contact with the public, at no more than a regular pace.

(8) The claimant is unable to perform any past relevant work.

(9) The claimant was born on July 11, 1959 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

(10) The claimant has at least a high school education and is able to communicate in English.

(11) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

(12) Considering the claimant's age, education work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(13) The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2006, through the date of this decision.

AR 14-21.

The ALJ found Morrison had no severe physical impairments based on Dr. Latella's consultative examination. AR 14. He stated Dr. Latella's findings were consistent with the medical evidence as a whole and gave them considerable weight in concluding Morrison's physical impairments were non-severe. *Id.*

In analyzing Morrison's RFC, the ALJ discredited third party function reports provided by Morrison's friends. The ALJ did not give their opinions much weight

because he noted they were "not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms." AR 16. He also discounted their opinions because they could not be considered disinterested witnesses by virtue of their relationship with Morrison. *Id.* Finally, the ALJ also found their opinions, like Morrison's allegations, inconsistent with the preponderance of the opinions and observations by medical doctors. *Id.*

The ALJ found that Morrison had severe mental impairments of depression and bipolar disorder with an extensive treatment history. AR 17. However, he noted her symptoms were often exacerbated by relationship issues with her boyfriend and housing concerns. *Id.* The ALJ acknowledged that Morrison had been hospitalized on multiple occasions for suicidal ideation and depression. *Id.* He extensively discussed Morrison's job search and stated, "The record indicated the claimant felt she was able to work, but could not find a job." *Id.* She had applied at multiple places and consulted vocational rehabilitation services, but would forget to fill out an application, or would not receive a positive response. *Id.* Some of her difficulties obtaining a job were attributed to her felony conviction. *Id.* The ALJ cited the regulations and reasoned that a person who retains the capacity to do work, but cannot obtain work due to other factors, such as the hiring practices of employers, will not be considered disabled. *Id.*

In analyzing the medical evidence, the ALJ assigned Dr. Bernhagen's opinion limited weight in light of Morrison's job search, discounting his opinion that she was unable to meet competitive standards and had no useful ability to function in numerous areas of mental abilities and aptitudes needed to do unskilled work. *Id.* He also found that the treatment notes were more consistent with the RFC he outlined rather than the one expressed in Dr. Bernhagen's questionnaire. The ALJ gave great weight to the opinions of the state agency medical consultants and consultative examiners.

The ALJ did not find all of Morrison's subjective allegations fully credible based on the fact that her treatment "centered on environmental situations," such as her housing concerns and relationship issues. AR 19. She also sought employment while allegedly disabled and indicated her past felony conviction, rather than her mental impairments, prevented her from working. *Id.* The ALJ indicated that the limitations of simple, routine, repetitive work with only superficial contact with the public at no more than regular pace were supported by substantial evidence in the record.

The ALJ found that Morrison could perform the jobs of laundry worker, kitchen helper, or cook's helper, which were available in significant numbers in the national economy. AR 20. Therefore, he found Morrison was not disabled. AR 21.

### *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental,

sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the

burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not

"reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## Discussion

### A. Evaluation of Medical Opinions

Morrison argues the ALJ improperly discounted the opinion of her treating psychiatrist, Dr. Bernhagen. She argues the ALJ erred by finding Dr. Bernhagen's opinion inconsistent with the record as a whole, particularly in regards to her job search. Morrison characterizes her job search as an unrealistic expectation stemming from her mental impairment and states Dr. Bernhagen's opinion reflects this concern and it should not be used as a basis for discrediting his opinion.

The Commissioner responds that the ALJ appropriately assigned Dr. Bernhagen's opinion limited weight because it was inconsistent with Morrison's behavior and the limitations he identified were inconsistent with his own treatment notes and other substantial evidence in the record.

The ALJ gave Dr. Bernhagen's opinion, as expressed in the mental RFC questionnaire, limited weight. AR 17. Dr. Bernhagen listed severe symptoms and limitations and said Morrison's prognosis was poor. *Id.* He also concluded Morrison was unable to meet competitive standards and had no useful ability to function in numerous areas of mental abilities and aptitudes needed to do unskilled work since December 2008. *Id.* Dr. Bernhagen estimated Morrison would miss more than four days of work per month because of her symptoms. *Id.* The ALJ reasoned Dr. Bernhagen's opinion was not fully consistent with the record as a whole. He found it inconsistent that Dr. Bernhagen believed Morrison's limitations dated back to December 2008, but she had been actively seeking employment since this time and expressed frustration at not being able to obtain work. She had applied to multiple places in November 2009, but did not know why she could not gain employment. The ALJ stated, "The claimant clearly continued to experience symptoms and limitations, but treatment records are more consistent with the residual functional capacity detailed in this decision than the conclusions reached by Dr. Bernhagen in his questionnaire." AR 18.

20 C.F.R. § 404.1527(c)(2) governs the analysis for establishing the weight that should be given to treating physicians' opinions.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight

to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

The following factors determine how much weight should be given to a non-controlling medical opinion:

(1) whether the source has examined the claimant;
(2) the length, nature and extent of the treatment relationship and the frequency of examination;
(3) the extent to which the relevant evidence, 'particularly medical signs and laboratory findings,' supports the opinion;
(4) the extent to which the opinion is consistent with the record as a whole;
(5) whether the opinion is related to the source's area of specialty;
(6) other factors 'which tend to support or contradict the opinion.'

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (citing *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)).

The ALJ's reasons for giving Dr. Bernhagen's medical opinion limited weight are not supported by substantial evidence in the record. First, the ALJ states Dr. Bernhagen's opinion is inconsistent with Morrison's own behavior, because she continued to seek employment and expressed frustration at not being able to obtain work. The ALJ noted that she had applied to multiple places in November 2009 and stated she did not know why she could not gain employment. AR 17. The ALJ accurately describes Morrison's efforts to find a job, but I do not agree that such efforts are necessarily inconsistent with or detract from her treating physician's opinion describing the symptoms and work-related limitations of her mental condition.

Under some circumstances, contemplating work indicates the claimant does not view his or her condition as disabling. *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995). This is especially persuasive for impairments relating to pain where performing work-related activities is a direct contradiction of allegations that the pain prevents the claimant from doing such activities. *See Goff*, 421 F.3d at 792 (discrediting subjective

allegations of disabling pain because claimant was able to work as a part-time kitchen aide, vacuum, wash dishes, do laundry, cook, shop, drive, and walk.).  The same is not true for mental impairments, where symptom-free periods are often inherently characteristic of such impairments.  *See Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) (citing *Poulin v. Bowen*, 817 F.2d 865, 875 (D.C. Cir. 1987)) ("[a]lthough the mere existence of symptom-free periods may negate a finding of disability when a physical ailment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim.").  In some circumstances, "[w]here an applicant has unsuccessfully attempted to secure employment, less evidence is needed to support a finding of disability than where the applicant has failed to make such an effort."  *Walston v. Gardener*, 381 F.2d 580, 586-87 (6th Cir. 1967). The ALJ should "take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes."  *See Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984) (citing *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982)).

In *Tennant*, the claimant had "inadequate personality" disorder.  *Tennant*, 682 F.2d at 710.  He held 46 jobs in his 12 years of employment with his longest tenure being six months.  *Id*.  It appeared he had been fired from most of those jobs.  *Id*.  The court stated there was "virtually no evidence in the record to support a finding that Tennant [could] engage in substantially gainful employment," even though a psychiatrist who had examined him three times said he could be expected to sustain work, have adequate attendance and meet production norms.  *Id*.

Morrison has demonstrated a desire to be gainfully employed, but she has not been able to obtain or maintain employment for a significant period of time.  There is some evidence that Morrison was disqualified from certain jobs due to her past felony conviction.  There is also evidence she lost a job due to an unexcused absence for attending her ex-husband's funeral.  However, other evidence in the record suggests she lost jobs because she was not being efficient enough or she quit because she was

very emotional and could not handle criticism well.  AR 860, 898.  In another past job of longer duration, Morrison was allowed to work a midnight shift to accommodate her difficulty being around others.  AR 248, 438, 543.  Her forgetfulness at that job almost caused problems with a restaurant inspection.  *Id.*  Morrison's work history indicates she held approximately 20 jobs since 1995, with most jobs lasting only a few months at a time and not qualifying as substantial gainful activity.  AR 165, 180-81.  "A claimant may be unable to engage in substantial gainful activity when he can find employment and physically perform certain jobs, but cannot hold the job for a significant period of time."  *Popp v. Barnhart*, 64 F. App'x 602, 603-04 (8th Cir. 2003) (citing *Gatliff v. Commissioner*, 172 F.3d 690, 693-94 (9th Cir. 1999)).

The fact that Morrison continued to seek employment and even worked for brief periods of time since her alleged onset date is not evidence that she retains the mental RFC to work full-time, especially in light of her treating physician's opinion to the contrary.  *See Anderson v. Astrue*, C06-3066-MWB, 2007 WL 4404639, at *25 (N.D. Iowa Dec. 13, 2007) (finding it was error for the ALJ to discount a medical source opinion about claimant's mental abilities based on the claimant's attempts to find work).  Dr. Bernhagen was aware that Morrison constantly sought employment and he noted that her work history demonstrated she had difficulty maintaining work.  AR 855, 897.  Despite these efforts, he still found she would be unable to meet competitive standards in areas such as carrying out short and simple instructions, maintaining attention for a two-hour segment, and performing at a consistent pace without an unreasonable number and length of rest periods.  AR 881-82.  He also found that she had no useful ability to function in areas such as maintaining regular attendance and being punctual within customary, usually strict tolerances and completing a normal workday and workweek without interruptions from psychologically-based symptoms.  *Id.*  He noted that she was severely depressed and had "not been able to maintain or sustain employment due to these symptoms."  AR 882.  "In order to find that a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to

perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which people work in the real world." *Payton v. Shalala,* 25 F.3d 684, 687 (8th Cir. 1994) (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)). Morrison's work history and unsuccessful pursuit of employment support Dr. Bernhagen's opinion if anything and they should not have been used as a reason to discredit it.

The ALJ also gave Dr. Bernhagen's opinion limited weight because "treatment records are more consistent with the residual functional capacity detailed in this decision than the conclusions reached by Dr. Bernhagen in his questionnaire." AR 18. The ALJ made the following RFC determination:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine, repetitive work with only superficial contact with the public, at no more than a regular pace.

AR 15.

I find that this was not an adequate reason for discrediting Morrison's treating physician's opinion because it is not supported by substantial evidence in the record. An ALJ may credit the opinion of other medical assessments over the treating physician's opinion if they are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001). "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999).

The ALJ did not specify the inconsistencies between Dr. Bernhagen's opinion and his treatment notes and did not explain what makes the treatment notes more consistent with the RFC. He only stated, "Treatment notes in the record do not sustain the claimant's allegations of disabling symptoms" and "treatment records are more

consistent with the residual functional capacity detailed in this decision than the conclusions reached by Dr. Bernhagen in his questionnaire." AR 18-19.

Dr. Bernhagen's and Mr. McCard's treatment records contain no discussion of Morrison's work-related limitations, but do list objective findings of her appearance, eye contact, psychomotor activity, mood, affect, thought-process, thought content, sensorium and cognition, and judgment and insight during her appointments. AR 855. While Morrison's thought process was almost always goal-directed and her sensorium and cognition grossly intact, her psychomotor activity was usually decreased, her mood depressed, her affect congruent, and her judgment and insight limited or fair. AR 751, 842, 846, 851, 855, 899, 901. There are also several instances where Morrison's suicidal thoughts are noted in the treatment records, as well as an actual suicide attempt in late August 2010. AR 843, 846, 851, 855, 888, 901, 906. Morrison's GAF scores were slightly higher in the treatment records than Dr. Bernhagen's score of 40 in the questionnaire, but she often scored in the 41-50 range which indicates "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32; AR 840, 844, 853-54, 905. Morrison's initial appointment with Dr. Bernhagen and Mr. McCard indicated a relatively normal level of functioning and Morrison reported she had been having more "highs" than "lows" associated with her bipolar disorder. AR 733. However, the mere existence of symptom-free periods which may negate the finding of a physical disability does not necessarily compel such a finding when the alleged disability is a mental disorder. *Andler*, 100 F.3d at 1393. Other treatment notes in the record either pre-date Morrison's alleged onset date of disability or are from Allen Hospital, both of which demonstrate severe symptoms of depression, including suicidal ideations.

None of the treatment records address Morrison's abilities to function in the workplace. They only note that she was actively seeking work and had difficulty maintaining work in the past. The ALJ should obtain "medical evidence that addresses the claimant's ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704

(8th Cir. 2001). The only evidence lending any support to the ALJ's RFC finding is the RFC assessment from the state agency medical consultant, a non-treating source.

The state agency medical consultant found Morrison "capable of moderately complex activities that do not require intense concentration, extensive social interaction or frequent changes in routine." AR 757. However, he also listed Morrison's functional limitations such as needing reminders to go places and take medication, being forgetful and distractible, having difficulty following instructions, and responding poorly to stressors and changes in routine. He found these functional limitations were partially supported by the evidence. This finding was based on Morrison's subjective complaints and a review of the treatment records, which did not include Dr. Bernhagen's opinion or any treatment records from 2010. In *Singh v. Apfel*, 222 F.3d 448 (8th Cir. 2000), the court found that the record was "replete with evidence that substantiate[d] the opinion of Singh's treating physician," and the only contrary evidence came from the opinions of non-treating physicians. There, the court held that the ALJ improperly disregarded the conclusions of the claimant's treating physician. *Singh*, 222 F.3d at 452. "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003).

The ALJ and the state agency medical consultants emphasize the fact that Morrison's symptoms appeared to be exacerbated by housing concerns or relationship issues, and her symptoms stabilized after changes were made to her medication. AR 17, 19, 757. "An administrative law judge may not draw upon his own inferences from medical reports." *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975). *See also Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir. 1992) (per curiam) (noting that it is reversible error for an ALJ to substitute his own unsubstantiated conclusion concerning a mental impairment for the express diagnoses of an examining psychiatrist). By stating that Morrison's symptoms were "exacerbated by environmental situations" and

the majority of her treatment was "centered on environmental situations" as a basis to discount her treating physician's opinion, the ALJ made an improper inference that Morrison's condition was situational or less severe than indicated by her treating physician. Such an inference is also not supported by substantial evidence.

Dr. Bernhagen and Mr. McCard often noted Morrison's significant history with depression and bipolar disorder. Morrison began seeing mental health providers in 7th grade and she was diagnosed with bipolar disorder in 1986. AR 732-34,737. She has taken psychotropic medication for over 20 years. AR 584. Although Morrison's subjective complaints frequently revolved around her housing concerns and relationship issues, her treating sources never diagnosed her with situational depression or considered her impairment temporary or associated with her current living situation. For the ALJ to infer that these subjective complaints formed an appropriate basis to discredit Morrison's treating physician's opinion was error. *See Branson v. Callahan*, 14 F. Supp. 2d 1089, 1097 (N.D. Iowa 1998) (analyzing a similar inference by the ALJ and suggesting that based on the record, including the physician's opinion rendered in a questionnaire, the claimant's depression was better characterized as chronic, with periods of acute, heightened severity caused by particularly stressful circumstances).

The ALJ's assertion that the treatment records are more consistent with the RFC finding is not supported by substantial evidence and is therefore not a proper basis for the ALJ to rely on the state agency medical consultant's opinion over the treating physician's. I have been unable to identify the inconsistencies alluded to by the ALJ and find that Dr. Bernhagen's opinion is well-supported by the treatment records. It appears the ALJ discredited Dr. Bernhagen's opinion primarily based on Morrison's job search and an improper inference on the nature of Morrison's condition, rather than a finding that the treatment records actually supported a different conclusion. While the ALJ is directed to consider "all the evidence in the record" in determining RFC, "some medical evidence" must support the claimant's RFC. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). The only evidence that supports the ALJ's RFC

determination here comes from the state agency medical consultant's opinion, which does not constitute substantial evidence on its own. The ALJ therefore erred in discounting Dr. Bernhagen's opinion by reasoning that the treatment records were more consistent with the RFC finding.

### B. Claimant's Credibility

Morrison argues the ALJ's credibility determination was flawed because he did not fully credit the RFC questionnaire completed by Dr. Bernhagen. The Commissioner responds this is a reiteration of Morrison's first argument, and references his previous arguments. However, the Commissioner goes on to explain why the ALJ's credibility analysis, including Morrison's credibility, is supported by substantial evidence.

I will not address the ALJ's evaluation of the medical opinions, as that issue has already been discussed, but I will consider whether the ALJ properly evaluated Morrison's credibility. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). If the ALJ's determinations regarding the credibility of testimony are supported by good reasons and substantial evidence, the court will defer to them. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). In evaluating credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). "Other relevant factors include the claimant's relevant work history, and the absence of objective medical evidence to support the complaints." *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (quoting *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ need not explicitly discuss each factor, as long as the ALJ acknowledges and considers the factors before discounting the claimant's subjective complaints. *Goff*, 421

F.3d at 791. If an ALJ discounts a claimant's subjective complaints, he or she is required to "detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Lewis*, 353 F.3d at 647).

The ALJ acknowledged the *Polaski* factors and found that the record did not fully support the severity of Morrison's allegations. Specifically, the ALJ noted that the majority of her treatment was focused on housing concerns and relationship issues and that she continued to seek employment while alleging disability. The ALJ also commented that while Morrison reported symptoms of anxiety and depression, she said her past felony conviction, rather than her impairments, prevented her from working.

For many of the same reasons it was improper to discredit Dr. Bernhagen's opinion based on these factors, it was also improper to discredit Morrison's subjective allegations. This is primarily because these reasons are not supported by substantial evidence in the record and make assumptions about the nature of Morrison's mental impairments, which are not corroborated by medical evidence. In some circumstances, "[s]eeking work and working at a job while applying for benefits, are activities inconsistent with complaints of disabling pain." *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) (citing *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996)). However, and as I noted earlier, symptom-free periods are characteristic of mental impairments and the ability to work during these periods does not necessarily undermine the severity of those impairments. Accordingly, the ALJ should "take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes." *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984).

Morrison demonstrated a consistent desire to work, and when she did obtain employment, it did not last long. The ALJ discredits Morrison's claim of disability based on her desire to work and the fact that she believed she had trouble getting work because of her past felony conviction. However, the ALJ failed to consider the

substance of Morrison's work history, which should have included an examination of the brevity of the jobs she held and why she left them, along with a consideration of whether Morrison's desire to work was a reasonable expectation in light of the limitations identified by her treating physician. Morrison held several jobs that did not amount to substantial gainful activity and lasted less than a year. AR 165, 180-81. In one job, she was given special accommodations so she could work alone, and she had to leave other jobs because she was not efficient enough or "very emotional and not able to handle criticism well." AR 248, 438, 543, 860, 898. Dr. Bernhagen knew Morrison was constantly applying for work and was aware of her work history, yet he found severe work-related limitations which are supported by the medical evidence. Without an examination of the nature of her entire work history or citing medical evidence contrary to the opinion of her treating physician, it was improper for the ALJ to discredit Morrison's allegations simply based on the fact that she continued seeking employment.

The ALJ's other reason for discrediting Morrison's allegations is also not supported by the record as a whole and not necessarily inconsistent with a claim of disability. The ALJ discredited Morrison's allegations because the majority of her treatment was focused on housing concerns and relationship issues. As discussed above, discrediting Morrison's allegations on this basis contains an improper inference about the severity of Morrison's impairment that is unsubstantiated by the record. Morrison has a history of bipolar disorder and depression along with psychiatric treatment and medication that exceeds 23 years. AR 738. Her most-recent records indicate she was seeing Dr. Bernhagen or Ms. Hull two to three times every week, which Morrison confirmed in her testimony. AR 897-905. Her treatment also focused on suicidal thoughts she had on multiple occasions, especially because Morrison had previously attempted suicide by overdosing on her medication. AR 843, 846, 851, 855, 888, 901, 906. Finally, a significant part of her treatment was dedicated to medication management. Dr. Bernhagen increased, added to, or changed her

medication several times. AR 732, 846, 851, 855, 901. While Morrison frequently brought up her housing concerns and relationship issues with Dr. Bernhagen and Mr. McCard, they never indicated an association between her current living situation and her symptoms that would indicate her depression and bipolar disorder were temporary or situational. The medical records would more appropriately support a conclusion that her inability to deal with stressful situations is a result of her impairments and not a reason to discredit their severity.

The ALJ's analysis of Morrison's credibility is not supported by substantial evidence in the record. In fact, Morrison's unsuccessful attempts at employment and her responses to housing and relationship issues supports her claim of disabling impairments and is corroborated by the opinion of her treating physician.

## C. Hypothetical Question to VE

Morrison argues the ALJ's hypothetical question to the VE was flawed because it did not include all of the limitations identified by Dr. Bernhagen, and nothing in the evidence contradicts the restrictions he identified. She therefore argues that the VE's answer to the ALJ's hypothetical question cannot be considered substantial evidence that Morrison can perform other work.

The Commissioner counters that the ALJ included all of the credible limitations identified by Dr. Bernhagen in the hypothetical question. Additionally, the Commissioner argues the ALJ properly assessed Morrison's RFC and the limitations identified in the hypothetical were supported by substantial evidence.

The Commissioner has the burden at step five to prove "the claimant is able to perform other work in the national economy in view of her age, education, and work experience." *Harris v. Barnhart*, 356 F.3d 926, 929 (8th Cir. 2004). The Commissioner may use a VE's response to a properly formulated hypothetical question to show that jobs exist in significant numbers for a person with the claimant's RFC. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e); *Guilliams*, 393 F.3d at 804. "A vocational

expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). It need only include "those impairments and limitations found credible by the ALJ." *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005). "[T]he hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the 'concrete consequences' of those impairments." *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quoting *Roe v. Chater*, 92 F.3d 672, 676-77 (8th Cir. 1996)). It should not be based "solely upon the ALJ's assumptions, without medical corroboration" which will be considered "devoid of usefulness or meaning." *Morse v. Shalala*, 16 F.3d 865, 874 (8th Cir. 1994) (citing *Mitchell v. Sullivan*, 925 F.2d 247, 249-50 (8th Cir. 1991)).

The hypothetical the ALJ relied on included limitations of simple, routine, repetitive work, superficial contact with the public and regular pace. AR 46. The VE testified that Morrison would be unable to perform any of her past relevant work under this hypothetical, but she could do work as a laundry worker, kitchen helper, or cook's helper. AR 46-47. The ALJ gave a second hypothetical with the same limits to simple, routine, repetitive work, but added no contact with the public and slow pace for up to one-third of the day. AR 47. The VE stated that such a person would not be employable on a full-time competitive basis. *Id.*

Morrison's attorney also gave a hypothetical of an individual who could not satisfactorily perform the following activities: understand, remember, and carry out very short and simple instructions, maintain attention for a two-hour segment, make simple work-related decisions, get along with co-workers and peers, and deal with normal, everyday work stress. AR 47-48. The VE testified that such a person could not be competitively employed on a full-time basis. AR 48.

Because the ALJ's hypothetical question was based on an RFC that did not encompass all of the "concrete consequences" of the limitations identified in Dr.

Bernhagen's questionnaire, and relied on improper assumptions made by the ALJ, the VE's response cannot be considered substantial evidence. As discussed above, the ALJ improperly evaluated the medical opinions by assigning Dr. Bernhagen's opinion "limited weight" and the state agency medical consultant's opinion "great weight" when Dr. Bernhagen's opinion was consistent with and supported by treatment notes and other substantial evidence in the record as a whole. The hypothetical relied on by the ALJ does not even include some of the significant limitations identified by the state agency medical consultant, such as difficulty getting along with others, forgetful and distractible, difficulty following instructions, and responding poorly to stressors. The ALJ's second hypothetical question more appropriately captures these limitations and the ones identified by Dr. Bernhagen as well as the hypothetical posed by Morrison's attorney. AR 47-48. In response to both of these hypotheticals, the VE stated such a person would not be employable on a full-time competitive basis. *Id.* The Commissioner failed to meet his burden of showing that a significant number of jobs exist in the national economy that Morrison can perform. Therefore, substantial evidence does not support a finding of no disability.

### Conclusion

In reviewing the final decision of the Commissioner, "[t]he court shall have power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The court may enter an immediate finding of disability only if the record "overwhelmingly supports" such a finding, otherwise, the case is remanded for further administrative proceedings. *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000).

The court finds such overwhelming support here. Dr. Bernhagen outlined significant limitations such as difficulties maintaining attendance, completing a normal workday and workweek without interruptions from psychologically-based symptoms,

dealing with normal work stress, maintaining attention for two-hour segments, and carrying out and understanding short and simple instructions, which are supported by substantial evidence in the record as a whole. Where the record "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." *Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir. 1991).

The only remaining issue is the proper onset date of disability. Morrison alleges an onset date of November 1, 2006, and Dr. Bernhagen has estimated that her limitations date back to December 15, 2008. There is no medical evidence between November 1, 2006, and September 2008, when Morrison began seeing Dr. Bernhagen. Social Security Ruling 83-20 sets forth the guidelines for determining the onset date of disability. *Grebenick v. Chater*, 121 F.3d 1193, 1200 (8th Cir. 1997). The onset date is the first day an individual is disabled. SSR 83-20, 1983 WL 31249, at *1 (Jan. 1, 1983). For disabilities of nontraumatic origin, the claimant's allegations, work history, and medical and other evidence concerning the severity of his or her impairment should be considered. *Id.* at *2. Medical evidence "serves as the primary element in the onset determination." *Id.*

> The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in [substantial gainful activity] (or gainful activity) for a continuous period of a least 12 months or result in death. Convincing rationale must be given for the date selected.

*Id.*

Based on this standard, I find that December 15, 2008, is the appropriate onset date. Although Morrison has a long history of bipolar disorder and depression, no treating source prior to that date identified such severe limitations as those found by Dr. Bernhagen and there is no medical evidence from late 2006 to 2008 to support a finding of disability. An onset date of December 15, 2008, is supported by the medical evidence and the record as a whole.

For these reasons, the ALJ's decision is **reversed**. Judgment will be entered in favor of Morrison and against the Commissioner, and this case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and award of benefits with a disability onset date of December 15, 2008.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer*, 509 U.S. 292 (1993).

**IT IS SO ORDERED.**

**DATED** this 28th day of November, 2012.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA